You may begin whenever you're ready. Thank you, Your Honor, and may it please the Honorable Court, I'm here for the appellant, Poco, and I would like to reserve two minutes of my time. I understand I'll have to keep track of that. Yes, would you identify yourself for the record? Yes, I'm Emanuel Jakobowitz, and I'm here for Poco, LLC, and we're here on summary judgment on questions of Washington State law, specifically the duty owed by an insurer, especially under the Washington Consumer Protection Act. And I want to narrow in right at the start on a particular point of Washington regulation as to that, because Washington gives the insurer a strong duty of honesty and candor and specifically says that it is per se unfair and deceptive for purposes of consumer protection. This is at Administrative Code 284-30-331, to misrepresent pertinent facts or insurance policy provisions, and the regulation even goes on to expand on that a little later at dash 350, where it's sub 7, where it says this includes making a payment without notifying the insured that it may seek reimbursement, if that be the case. So what's the material misrepresentation that's in play here? The material misrepresentation is that at the same time that they were giving us a check for $1.4 million and saying that their reinsurer, the RMA and FCIC, the Department of Agriculture, had signed off on the deal and it was fine and had released its claims. At the same time, it knew and did not tell us that the Washington Department of Agriculture was working to prepare a criminal case for restitution of that same money, in which our acceptance of that check would be part of the indicted facts, and that we would be embroiled in a criminal case where Mr. Peterson, the principal of POCO, would be at threat of jail for the rest of his natural life, not to mention having to give all the money back, which is, after all, what we were trying to settle in that settlement. Could you pinpoint for me the where in the record it shows or demonstrates that when they were negotiating the settlement, that FCIA knew that a criminal investigation was underway? Absolutely. I refer the Court to excerpts of record at 258, page 258 to 259. These are notes, contemporaneous handwritten notes of a conference call between officials at the RMA and FCIC and Farmer's Crop, including John Rekus, counsel who was handling this matter. Now, what happens to those notes? Do those notes reference an ongoing criminal investigation? Yes, it does, Your Honor. Specifically, it calls out that we are looking at this was, and I'll put that in a little context if I may, this was after a letter went out from RMA to FCI, to Farmer's Crop, saying, hold on, we're doing an investigation, do not go forward with payments on any of these claims to any of these claimants, any of these related claimants. And what happens then is a conference call because, again, this is in the record at ER 246 to 247, Farmer's Crop is asking, well, what authority do you have and what authority do we have to hold up claims for that reason? It's not in the policy provisions. So then, in the conference call, we have all these claims discussed, specifically calling out the issues of the potatoes, the specific gravity of the potatoes, the processor contract, all the things that were brought up in the criminal indictment, and it says, maybe we need to get, this is someone from the RMA telling Farmer's Crop, maybe we'll get a letter from the OIG to stop payment. What's the OIG? The OIG is Office of the Inspector General. That's the criminal prosecution arm that works with the DOJ to prepare criminal cases. And Mr. Rakes later testified at the criminal trial, oh, yes, there were contacts with the Department of Justice, and I understood that this was a contact with the criminal prosecution arm of the Department of Justice about these claims. So, yes, Farmer's Crop knew. Farmer's Crop simply decided not to tell us. You're alleging that Farmer's Crop knew, and you're pointing to some bits and pieces, which I have to say, so I start looking, as I've looked before, at 258 and 259 and other citations. I don't see criminal there. And if you have something specific I should look at, please point me to it. Your Honor, the word criminal isn't needed if the OIG is mentioned. The OIG does a lot more than criminal. I mean, we're threatened with, the judiciary is threatened with Inspector General's a whole lot. We know a lot about Inspector General's. That doesn't seem to say the same to me. It's the prosecutor. Indeed, it's not part of the DOJ, is it? It's not part of the DOJ. It's part of the Department of Agriculture that works with the DOJ. And as Mr. Rakes testified, that was the whistle-blower in the Department of Agricultural Employees, too. So that's really what the Inspector General does, looks at the government employees. It doesn't put together cases against outsiders. In this case, yes, Your Honor. Apparently it did because it was working with DOJ, as we know from Mr. Rakes' testimony. See, you're making the assertion it was working for criminal prosecution, but so far that seems to be a supposition based on not very much. I will, Your Honor. Let me try something else then. Suppose State Farm is working, concerned that there may be an insurance scam going on someplace, so works with the prosecutor and puts together a sting-type operation in the State of Washington, somebody who's doing fraudulent insurance, auto accident claims. You're telling me that by settling those claims, State Farm has violated consumer protection law? Yes, Your Honor. If it's similar circumstances to this, yes, the insurance companies under Washington State law have duties to their insured with regard to the claim settlement process. They're not supposed to be informally deputizing themselves to entrap their insured. That is not good faith. But how are they responsible for the decisions to bring or not bring criminal prosecutions? Because the settlement, the government is not party to the settlement and could not possibly promise that there would be no criminal investigation or prosecution. I'm glad you brought that up because I think that is exactly where the district court got the wrong end of the stick. Because the district court saw it exactly that way. This clearly doesn't constitute an immunity deal. It's not with the DOJ. How then – and the answer is, we're not asking that – we're not saying that this should have been or could have been read as an immunity deal. What we're saying is that it was material. It was highly material to the question of whether claims were being released, whether this money was actually being given in good faith. It was given. And we should have been told this. The money was given. The money was given as it was. And as far as the person, the entity giving it, there were, in fact, no strings attached. The government came in afterwards and did something else. But at the time of the settlement, it was what it was, wasn't it? No, Your Honor. I'm afraid it wasn't. First of all, the settlement specifically calls out a settlement with the insurance companies, the reinsurer, which is the RMA and FCIC. And second of all, if you give a hand grenade with a string attached to the pin and don't tell us that there's a string attached, it's not exactly a good faith settlement of the claim. If we had known, we could have called – we were in front of this Court. We were in front of the mediator. We could have asked the mediator to bring in the DOJ more formally, not just with a phone call that we didn't hear about, to work with the DOJ and get this thing resolved before we incurred the massive expense and terror of an eight-week criminal trial. And I see my time is up. We're about to bubble. You may save the rest for the bubble. Thank you. Good afternoon, Your Honors. May it please the Court. I am Tom James. I represent Farmers' Crop Insurance Alliance in defense of this appeal. And there are a few things I wanted to bring to the Court's attention. This matter concerns Federal crop insurance coverage, which is not a lightweight topic. It's a very complicated field that has the word insurance in the name, but it's actually a government program delivered through private companies, as our briefing pointed out. The government regulates the program, writes all the coverage terms, all the loss adjustment terms. The terms are non-waivable. The program has been around a long time. It popped up originally in the New Deal, I believe, and now it's delivered through private companies. That's been the case since about the 1980s. It's a complicated area. This topic, on the other hand, about the release, is not so complicated. This dates back to a crop insurance policy from 2003. The policy required arbitration of any disputes concerning the policy. It was a narrow form of arbitration relating to resolving factual determinations. The company determined that there was not a payable claim here because there was no insurance, because there are strict requirements that have to be met in terms of submissions to the company on paperwork the government requires saying what acres have been planted. You have to do that by a deadline or else you can't get coverage for those acres. There were about 71 acres here that were not declared to the company at the time, so the company determined they weren't covered and said, we're not paying you. POCO contested that. POCO exercised its right to arbitration saying, pay us, pay us, pay us. The arbitrator agreed and said, pay them, but did so in a way where the arbitrator concluded that the facts were exactly what the company had decided. They didn't submit the form on time but said it was innocent, pay them anyway. That presented a dilemma and caused the company to go to court to contest the award under the Federal Arbitration Act. The district court decided against the company and, again, said, pay POCO and entered a judgment saying pay POCO. The company then went to the Ninth Circuit to appeal that as well because under the regulatory construct of the crop insurance program, they have a duty to the government to contest improper arbitration awards and to look out for waste, fraud, and abuse in the program. So they were also concerned their reinsurance would be denied because the way the program works is a partnership between the government and these private companies where there's a contract known as the standard reinsurance agreement that defines how the government reimburses the company for a portion of the policies. The government also covers about half the premium typically on the farmer's side, paying that to the company on their behalf. So that's the process as to how this moved forward. The government at the same time was apparently investigating potential crop insurance fraud in the region involving POCO and some of its principals and its agent and many other parties, all of whom were ultimately indicted for conspiracy to commit crop insurance fraud in 2011, over five years after this dispute was settled. Well, notably, they did allege in the indictment or complaint, I don't recall what document they proceeded on, but they did allege this particular dispute and the payment in this case. They did, Your Honor, this as one of many. What's important to remember is the indictment covered alleged fraud from 2001 through 2006 with all of these parties, and all of the criminal conduct occurred before the dispute even arose that led to the arbitration here. The arbitration concerned timing of a submission regarding acres. The indictment as to this particular policy and the others as to POCO concerned misreporting the value of potatoes that had been sold in the past. The way the coverage works is a farmer has a history of production or history of revenue in this instance, and that develops a baseline against which losses or gains are measured each year. And if you bring in less than the baseline, you get paid the difference. The government was essentially alleging that POCO had puffed up its baseline by inflating prior potato sales, which caused the loss to be bigger in particular years where there was a loss. That's the nature of the indictment as to the year that was in dispute here. That was never part of the dispute between POCO and Farmer's Crop. Farmer's Crop had no idea about any of that. It just knew it got a late form. So your opposing counsel points us to this page 259, 258 of the record, and it makes reference to OIG. Is that sufficient to create a material tribal issue of fact? No, Your Honor. Do you remember whether or not they had knowledge, whether you were obligated to disclose it? No, it does not, Your Honor. Why not? As the court has pointed out, OIG does a lot more than simply referring criminal matters to the U.S. attorney. It does have a duty to refer criminal matters when it learns of them to the U.S. attorney, but it's independent of agency management. And the structure here is Farmer's Crop was the insurer. It was under contract with Federal Crop Insurance Corporation, which is a federally owned corporation created by the federal government. It is administered by a USDA agency known as the Risk Management Agency. They are legally distinct, however. FCIC, the Federal Crop Insurance Corporation, is wholly owned by the government. That's who Farmer's Crop had a relationship with. Risk Management Agency, or RMA, does administer the crop insurance, I'm sorry, regulates the crop insurance program and ensures compliance as well. So the companies frequently have dealings with it because it tells them when it But it could not forbid the company from paying this claim in the first place if it had wanted to. The company would have been penalized had it done that. It might have had its reinsurance denied at the time, but the government Suppose this note said, you know, it says maybe get letter from OIG to stop payment. Suppose it said, you know, maybe there's a dash mark that said criminal investigation. Even then Would you have been obligated to disclose that fact? I don't believe so, Your Honor. If it were specific as to the specific circumstances of this particular crop year and the matters in dispute in the case, you might get closer to that line. But again, this was a broad investigation. The paperwork in the file and I believe even that reference shows that the concern there was 2004. That was the next crop year. Every year is a different policy and different concerns apply to it. Different terms apply sometimes. 2004 was actually the focus of those discussions because by this time we were in Discussions. Which ones are you referring to? The ones memorialized in the note in the record. On page 258. The notes dated 512.05. I don't have it in front of me, but the record referenced 258 to 259, I believe is what he referenced, or 246 to 247. The context from all of those reflects that it pertained to the 2004 crop year, not the one in dispute between the parties in the arbitration, because it had already rolled into 2005 and 2004 claims were being decided and the government warned the company it had a concern about the 2004 claims. We're not fighting about 2004 here. And the release was specific to 2003 as well. It has a defined subject matter in which it relates only to disputes between the parties to the release, which was Farmers' Crop and its parent Farmers' Alliance and POCO. Only as to disputes between them and only as to the 2003 crop year. POCO argues that, with the boilerplate language that's in this release, that it insurance company's clause and that that granted either the impression of immunity or they tried to argue actual immunity in the criminal case. But that's preposterous. And Judge Bastian thought that was preposterous. Suppose, let me separate the factual from the legal theory. Suppose, in fact, the situation was such that your client knew that a criminal investigation was going on and, indeed, set this up as some kind of sting operation. Decided, okay, we'll get POCO to take this money and use that as part of our criminal case against POCO. Your understanding is would that be unlawful under Washington Consumer Protection Law? And if so, why not? Well, the Washington law wouldn't apply if the company had done that, which isn't what occurred. And there's no evidence that occurred. But if that had occurred, presumably it would have been pursuant to procedures issued or mandated by the Federal Government. And although I said earlier the company couldn't be told not to pay the claim under the circumstances as they exist, the company has a contractual and a regulatory obligation to follow procedures of the Federal Crop Insurance Corporation and RMA. And if those procedures said set up the insured when you determined that potential fraud is happening and do these things, yes, the company would have been. So they could tell you to pay. They might not be able to tell you not to pay, but you're saying, in effect, they could say pay this. Well, they could say don't pay in later years. And that's a peculiarity here, too. But the policy terms preempt state law. So Washington law would be overridden. The reason I say in later years, this relates back to that note about OIG. The very next year, the policy terms radically changed in the CFR. And they included a new clause that adopted what had just been procedure before, which says if OIG is investigating potential crop insurance fraud, the insurance provider was forbidden from paying the claim while the investigation is pending. That's why there was a request, or at least a mention of it. So you're saying under the new rules, they wouldn't have received this money anyway. While an investigation was pending, they wouldn't have if the company had been notified it was pending. That would be true for the 2005 and later crop years, but not 2003. So essentially the court, district court, determined it was unreasonable as a matter of law for them to have relied upon whatever promise they read into this release. There was no such promise there. There was no inducement. There was simply POCO saying pay us, pay us, pay us, and eventually they got paid. There is one thing in the record I'll cite, and then I'm out of time here, and that is an e-mail from their counsel at the time, John Schultz, at record 172, where he spelled out the only thing that they were looking for in a release, and that was to make sure no one would pursue unpaid premiums from 2002. That was it. Thank you, Your Honors. I appreciate the time to be here. Thank you. Counsel, you have some rebuttal time remaining. Thank you, Your Honor. It's true that crop insurance is a complicated subject, but the faith, good faith owed by an insurance company licensed in Washington is not that complicated. When it comes to good faith, if you have to, the saying is if you have to ask should I do this, the answer is probably not. What's your response to the argument that had the Federal Government demanded a sting operation, that would have preempted any contrary Washington law? I would like to see the specific statutory or regulatory authority by which the Federal Government could deputize an insurance company licensed in Washington to entrap its subscribers. I don't believe there was one, at least at the time, and I don't think it should be just made up by the confluence of the insurance company and the Department. The – you know, if there's law on it, it's one thing. If it's just a general feeling of, oh, let's just take advantage of our insurer to keep our reinsurer happy, then no, Your Honor, I don't believe that would be proper, and I don't – I certainly don't think the Supremacy Clause requires it. That's the thing. An insurer in Washington has certain reasonable expectations about not being taken advantage of, certainly not if there isn't some specific provision in the policy that says it might be. The – Does that expectation extend to believing that an insurance company has the authority to sign off for the Department of Justice, that it won't pursue criminal prosecution? No, Your Honor. I believe it does not. It would include that if the insurance company has the Department of Justice call up the mediator of this court and say the government is fine with this settlement going ahead, and understanding that in some form that would get passed on to us, that we should be able to rely on that. It would rely on it for what? Well, I don't understand why you don't get to rely on it, because if the facts are as I understand them to be, you're dealing with a different insurance year in the criminal case than you are with the settlement. Oh, I'm out of time. Please answer. If I may answer that. Please. Thank you. Let me refer you, again, if I may, to the excerpts of record that I cited at the beginning. Yes. It says 2004 a million times. It does, but it also says 2003. When in the letter about the 2004 claim, it says these problems go back at least to 2001. Don't do any claims with these possible don't deliver on any claims for these policy holders. They're all bound up together as far as the Department of Justice. What is your response to the assertion that the investigation had to do with inflated allegations of potato sales versus acreage? Well, that's – I think that's not quite right. If I may – if I may go on. The criminal indictment seems to focus on the idea that the floor and ceiling price in the processor contract were fraudulent because Norcoto potatoes couldn't be grown to meet the standards of the ceiling price, which was not convincing to anybody at trial. But that wasn't an issue in the settlement, was it? Your Honor, not of this one. But that's the point. If the department is withholding the money because there's this conspiracy theory afoot in the government, and the department is ordering them not to do – not to go ahead with the mediation, not to go ahead with claim settlement, and then says, actually, go ahead with it, we should be informed so that we can make an – we can Thank you, counsel. The case just argued is submitted, and we thank both counsel for their arguments in this very interesting case.
judges: Graber, Paez, Clifton